UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARK DANE, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. _____ |
| Plaintiff, | § § | CLASS ACTION |
| vs. | § § | |
| UNITEDHEALTHCARE INSURANCE COMPANY, UNITEDHEALTH GROUP, INC., AARP, INC., AARP SERVICES INC., and AARP INSURANCE PLAN, | § § § § § | DEMAND FOR JURY TRIAL |
| Defendants, | § § § | May 9, 2018 |

**CLASS ACTION COMPLAINT**

Plaintiff Mark Dane ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against the herein-named Defendants, and alleges, based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters based upon, *inter alia*, the investigation of counsel, as follows:

## NATURE OF THE ACTION

1.       This is a putative class action on behalf of a nationwide class of Medicare eligible individuals who, by the unlawful acts alleged herein, are having a percentage of their monthly payments for Medicare supplement ("Medigap") insurance coverage diverted for an illegal purpose, namely to fund a premium rebating scheme between their group insurance plan's sponsor and the group plan's insurer.

2.       This premium rebating scheme, whereby over $400 million a year[1] is paid to the group policyholder, defendants AARP, Inc., AARP Services, Inc. and AARP Insurance Plan (collectively, "AARP"), is a blatant violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. §38a-815, *et seq.*, which governs the nationwide conduct of Connecticut's domestic insurance companies, including Hartford-based defendant UnitedHealthcare Insurance Company ("UnitedHealthcare"). UnitedHealthcare is the insurer of the AARP group Medicare supplement insurance plan ("AARP Medigap") at issue in this case. The scheme is also a breach of the express terms of the AARP Medigap group insurance contract between UnitedHealthcare and its insureds, and misleads consumers as to the insurance offered.

3.       Plaintiff seeks to: (1) stop these illegal practices going forward; and (2) recoup all illegal rebates that were covertly and unlawfully charged to member insureds by Defendants over

---

[1] For the year ending December 31, 2016, AARP, Inc. reported that it earned $598,500,640 in "royalty" income from UnitedHealthcare Insurance Company across all insurance products, up from $561,894,830 in 2015.

and above the true cost of the amounts due for insurance coverage under the group AARP Medigap plan.

4.      The basics of the scheme are as follows: AARP sponsors AARP Medigap, a group Medicare supplement insurance plan for its members, whereby AARP serves as the group policyholder of the plan and helps promote the plan by, among other things, actively soliciting AARP members and other eligible senior citizens to purchase an AARP Medigap policy.  In exchange for, among other things, AARP's sponsorship of the plan, selection of UnitedHealthcare as the insurer of the plan, and active solicitation of consumers, UnitedHealthcare allows AARP to take a rebate of 4.9% from every dollar that flows through AARP Medigap.

5.      Every month, after AARP siphons off its 4.9% share from the money that comes in from member insureds, AARP makes the monthly collective group plan premium payment to UnitedHealthcare in order to bind coverage – 4.9% lighter than the collective payments made by the consumers.

6.      This agreement to pay AARP a 4.9% rebate is documented in a side arrangement between AARP and UnitedHealthcare in a confidential private contract, outside of the actual group policy of insurance. In the side agreement, Defendants attempt to classify the 4.9% rebate as an "allowance" which they later renamed a "royalty." The original version of this confidential side contract explains that the "royalty" is for AARP's "sponsorship" of the group plan, and allegedly for the use of AARP's "intellectual property[.]"

7.      The group Medigap policy of insurance is comprised of: (1) the member insured's Certificate of Insurance (*see* Ex. A); (2) the member insured's application for insurance (*see* Ex. B); and (3) the Group Insurance Policy (*see* Ex. C) (collectively, "Policy").  The "royalty" side arrangement is not mentioned anywhere within the Policy, and is not part of the Policy.

8.      The motive for terming the hundreds of millions of dollars a year reaped pursuant to this scheme as "royalty" payments is to assist AARP in avoiding taxation. AARP does not have to pay taxes on the income if it is a royalty payment, whereas rebates are illegal, and sales commissions would require licensure and paying taxes. Regardless of the term used, however, the payments violate Connecticut's anti-rebating statute, and the express terms of the Policy, even if the payments truly are "royalty" payments.

9.      Large portions of the confidential "royalty" side arrangement were attached in redacted form to UnitedHealth Group's Securities and Exchange Commission ("SEC") filings from approximately 1997 to 2006.  *See* Ex. D ("1997 Agreement").  The most current version of the side arrangement, renewed in July 2017 ("2017 Agreement"), remains secret and confidential, held away from the view of member insureds.  However, the basics of the 2017 Agreement remain unchanged from the 1997 Agreement – UnitedHealthcare allows AARP to take 4.9% of every dollar that flows through the program before remitting the premium to UnitedHealthcare to bind coverage, 4.9% lighter than the amounts paid by consumers.[2]

10.     Whatever Defendants wish to call the illegal payment or how they wish to classify it, the payment meets the definition of a prohibited premium rebate under CUIPA:

> No insurance company doing business in this state, or attorney, producer or any other person shall pay or allow, or offer to pay or allow, as inducement to insurance, any rebate of premium payable on the policy, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement not specified in the policy of insurance. No person[3]

---

[2] OFFICE OF THE HEALTH INS. COMM'R, R.I., *UnitedHealthcare Ins. Co., Grp. Medicare Supplement - Standard Plans* (July 19, 2017), http://www.ohic.ri.gov/documents/UHLC-131050439.pdf.  *See* Attachment 11 to UnitedHealth's insurance rate filing with the State of Rhode Island noting that 4.9% is charged to consumers as a "royalty" each month, resulting in a "PMPM" (*i.e.*, per member per month) cost to consumers of $9.01. Shockingly, the 4.9% is the single largest expense of the insurance program -- ***it is more than double the 1.85% profit that UnitedHealthcare makes on the insurance program***.

[3] "Terms used in this title, unless it appears from the context to the contrary, shall have a scope and meaning as set forth in this section. . . . 'Person' means an individual, a corporation, a partnership, a limited liability company, ***an association***, a joint stock company, a business trust, an unincorporated organization or other legal entity." Conn. Gen. Stat. §38a-1.

shall receive or accept from any company, or attorney, producer or any other person, as inducement to insurance, any such rebate of premium payable on the policy, or any special favor or advantage in the dividends or other benefit to accrue thereon, or any valuable consideration or inducement not specified in the policy of insurance.

Conn. Gen. Stat. §38a-825.

11.     CUIPA makes clear at Conn. Gen. Stat. §38a-815 that the anti-rebating statute applies to Connecticut domestic insurers, like UnitedHealthcare, wherever they do business nationwide, "nor shall any domestic insurance company engage outside of this state in any act or practice defined in subsections (1) to (12), inclusive, of section 38a-816."[4]

12.      Connecticut law is thus undeniably clear: insurers headquartered in Connecticut are prohibited from rebating in violation of Conn. Gen. Stat. §38a-825, nationwide.

13.     In further breach of the Policy, Defendants are engaged in a separate but related scheme whereby AARP invests member insureds' monthly payments to earn money on short term investments before remitting the premium to UnitedHealthcare during the 31-day grace period after the monthly premium is actually due.  Not only is this part of the scheme not part of the Policy between UnitedHealthcare and its insureds, Defendants mislead insureds to believe that their payments ***made out to UnitedHealthcare*** are actually for AARP Medigap coverage, as opposed to an investment vehicle for AARP for a 31-day grace period before premium payments are sent to UnitedHealthcare to bind coverage.

14.     Simply stated, while insureds write their check each month to UnitedHealthcare thinking their coverage has been bound immediately, the money is actually diverted into AARP accounts where it is invested in securities for the sole and exclusive benefit of AARP.  Rather than the income from the investment of the premiums remaining with UnitedHealthcare in order

---

[4] Conn. Gen. Stat. §38a-816(9) incorporates as a prohibited practice any violation of Conn. Gen. Stat. §38a-825.

to reduce costs of the insurance program[5], or held in an account for the benefit of each insured, AARP illegally takes this income for itself, without consent of the insureds and without any support for this conduct in the Policy.

15.    AARP's covert insertion of itself into the premium collection process, and UnitedHealthcare's actions in allowing this to happen, limits UnitedHealthcare's ability to earn additional investment income and thus reduce "per member per month" costs of its insurance. Allowing AARP to secretly keep investment income from funds paid by member insureds, who think their payments are going directly to UnitedHealthcare, increases the cost of the insurance program and damages member insureds universally by increasing the costs of insurance.

16.    In addition to violating the terms of the Policy, which does not allow for such a diversion of funds to AARP, it is also another form of a premium rebate in violation of Conn. Gen. Stat. §38a-825 as it is certainly an inducement for AARP to allow UnitedHealthcare to be the only insurance carrier allowed to offer AARP Medigap coverage, resulting in tens of millions of dollars each year in investment income to the group policyholder AARP that should be held by UnitedHealthcare to reduce the costs of the plan, or returned to the member insureds. AARP's profits from this scheme are significant, and is just additional illegal compensation that flows from UnitedHealthcare to AARP since those earnings would normally go to the carrier, hopefully resulting in reduced premiums.  In 2016, AARP earned $45,766,000, and in 2015 *it lost* $3,984,000, on the investment of member contributions for all products across carriers that it held in the AARP Insurance Plan. Member insureds have no idea that the monthly payments they think are being made to UnitedHealthcare are being placed at risk in AARP's investment vehicle before coverage is actually bound.

---

[5] As noted in the same Rhode Island insurance rate filing identified at *supra* n.2, UnitedHealthcare factors in "investment income credit" as a way to reduce per member per month costs for insureds. Obviously, UnitedHealthcare cannot take full advantage of this if AARP is keeping tens of millions of dollars per year for itself in investment credits.

**JURISDICTION AND VENUE**

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

18.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because many of the acts and transactions giving rise to this action occurred in this District, because a named Plaintiff resides in this District, because UnitedHealthcare is a citizen of Connecticut, and because Defendants:

(a)    are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, solicitation, administration and sale of AARP Medigap group coverage in this District and nationwide from this District;

(b)    conduct substantial business in this District; and

(c)    are subject to personal jurisdiction in this District.

**PARTIES**

**Plaintiff**

19.    Plaintiff Mark Dane is a citizen of Connecticut, residing in Simsbury, Connecticut. Mr. Dane enrolled in AARP Medigap effective January 1, 2014, in Connecticut. Every month thereafter, Mr. Dane's bank account is electronically debited with the following notation entered, "DIRECT DEBIT UnitedHealthcaPREMIUM (Cash)" on his bank statements. Every month, Mr. Dane's account is billed for an amount that included the illegal rebate that flows to AARP as the group policyholder at the direction of UnitedHealthcare, in addition to the premium amount that is needed to bind coverage.  But for Defendants' unlawful and deceptive

acts, as alleged herein, Mr. Dane would not have willingly agreed to pay an illegal 4.9% charge above the premiums due to UnitedHealthcare to bind coverage every month.

20.     Mr. Dane was alerted to this scheme in March 2018 through his counsel.

**Defendants**

21.     Defendant AARP, Inc. is a non-profit corporation organized under the laws of the District of Columbia and maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049.  AARP, Inc. conducts substantial business in the State of Connecticut.

22.     Defendant AARP Services, Inc. ("ASI") is a wholly owned subsidiary of AARP, Inc. organized under the laws of Delaware.  ASI maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049.   ASI conducts substantial business in the State of Connecticut.  ASI is AARP, Inc.'s taxable "for-profit" division that negotiates, oversees, and manages lucrative contracts with AARP, Inc.'s insurance business partners. ASI is not licensed to solicit or sell insurance.  AARP, Inc. created ASI in 1999 pursuant to a settlement agreement with the U.S. Internal Revenue Service ("IRS") resulting from an investigation by the IRS into the large amount of income that AARP, Inc., a "non-profit" tax-exempt organization, earned through its "endorsement" deals.  This settlement was one of several that AARP, Inc. entered into with the IRS and other entities, such as the U.S. Postal Service and the tax authorities of the District of Columbia, all relating to AARP, Inc.'s failure to fully pay unrelated business income tax on its commercial activities, as well as improperly mailing health insurance solicitations at non-profit rates.

23.     Defendant AARP Insurance Plan is a grantor trust organized by AARP, Inc. under the laws of the District of Columbia and maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049, is wholly controlled and acts as an alter ego of AARP, Inc. (*see* Ex. E for the Trust declaration ("Trust Decl.").   AARP Insurance Plan, is the designated

policyholder under the Group Policy underwritten by UnitedHealthcare, and is the vehicle through which AARP, Inc. collects payments from member insureds and removes its premium rebate before paying the balance to UnitedHealthcare. In 2016, AARP Insurance Plan processed $10.3 billion in insurance payments from AARP members, the majority of which were AARP Medigap payments.

24.     At all material times, Defendant AARP, Inc. dominated and controlled Defendants ASI and AARP Insurance Plan. [6]

25.     Defendant UnitedHealth Group, Inc. ("UnitedHealth Group") is an insurance corporation organized under the laws of the State of Minnesota and maintains its corporate headquarters in Minnetonka, Minnesota.  UnitedHealth Group conducts substantial business in the State of Connecticut.  UnitedHealth Group is the largest single health insurer in the United States. UnitedHealth Group announced on July 17, 2017, that it "renewed and extended" its agreements with AARP and is thus at the center of this dispute along with its wholly owned and controlled alter ego UnitedHealthcare Insurance Company.[7]

26.     Defendant UnitedHealthcare Insurance Company is an operating division and wholly owned and controlled subsidiary of UnitedHealth Group and is domiciled in Hartford, Connecticut. UnitedHealthcare is a citizen of Connecticut. UnitedHealthcare conducts substantial

---

[6] AARP was originally founded in 1958 by retired teacher Ethel Percy Andrus, and insurance salesman Leonard Davis, who later leveraged his influence over AARP and its insurance programs to start the Colonial Penn Group insurance company in 1963. Over the years, controversy has followed the organization, mostly related to its involvement with, and revenue from, insurance sales to elderly members and the conflicts of interest it creates. Today, AARP is reported to have over 37 million members – about half of whom are over the age of 65.

[7] "UnitedHealth Group today announced it renewed and extended its exclusive relationship with AARP focused on improving the health and well-being of Americans 50 and older, including the most popular Medicare products among older Americans." *See UnitedHealth Group, AARP Extend Relationship Focused on Improving Older Americans' Health and Well-Being*, UNITEDHEALTH GRP. (July 17, 2017), http://www.unitedhealthgroup.com/newsroom/articles/feed/unitedhealth%20group/2017/0717aarprenewal.aspx.

business in the State of Connecticut, and nationwide from its headquarters in Connecticut. UnitedHealthcare is the insurer of AARP Medigap.

27.   Defendants UnitedHealth Group and UnitedHealthcare are collectively referred to herein as "UnitedHealth."

## FACTUAL ALLEGATIONS

28.   With 4.279 million member insureds as of December 2016, UnitedHealth is by far and away the largest Medigap insurer in the country.[8] UnitedHealth holds over 34% of the market share nationwide, which is more three times that of its closest competitor Mutual of Omaha. In certain states, such as Connecticut, UnitedHealth holds *63%* of the Medigap market share with 97,954 insureds. No matter the state however, all of these 4.279 million UnitedHealth insureds are certificate holders under the same AARP Medigap group plan, and thus are directly, albeit unwittingly, funding the rebating scheme in an identical manner.

29.   Pursuant to its exclusive arrangement with AARP, UnitedHealth's only Medigap product is the AARP Medigap group plan. So if a consumer wants UnitedHealth as its insurer for Medigap, they are forced to pay the AARP rebating fee of 4.9%. Conversely, AARP is prohibited from endorsing any other Medigap carrier. Each year, UnitedHealth pays to AARP, or more accurately allows AARP to extract from member insureds' monthly payments, over $400 million.

30.   Prior to partnering with UnitedHealth, AARP's Medigap group plan was underwritten by Prudential Insurance Company ("Prudential").  In 1996, UnitedHealth outbid Prudential so AARP switched carriers and moved its member insureds, the assets backing

---

[8] All enrollment and market share figures are as of December 2016 are made available by UnitedHealth here: https://www.aarpsupplementalhealth.com/legal/uhcmedsupstats.html.

AARP's group plan, and even the employees who ran the program, over to UnitedHealth as the group's new carrier.[9]

31.     Simply put, UnitedHealth bought its massive market share, and pays a premium rebate, funded by member insureds, every month through the present to its group policyholder AARP in order to maintain its dominate position in the Medigap market nationwide.

32.     As explained by AARP in its most recent financial disclosure statement, "Insurance premiums collected by the Plan are paid directly by participants.  At the direction of [UnitedHealth], certain agreed upon payments are made for royalties [a/k/a rebates] payable to AARP, Inc."[10]

33.     What AARP and UnitedHealth are doing with Class members' payments for AARP Medigap insurance coverage is functionally no different than a large employer offering group health insurance to its employees, and then taking 5% off the top of their employees' contributions for insurance coverage, with the consent of the insurance company.  Under CUIPA, such a scheme would be patently unlawful, as is Defendants' scheme.

34.     AARP explains its Medigap arrangement as follows, "The Plan, a grantor trust, holds group policies, and maintains depository accounts to initially collect insurance premiums received from participating members. In accordance with the agreements referenced above, collections are remitted to third-party insurance carriers within contractually specified periods of time, ***net of the contractual royalty payments that are due to AARP, Inc.***, which are reported as royalties in the accompanying consolidated statements of activities." (Emphasis added).  *Id.*  In

---

[9] *See* Milt Freudebheun, *Prudential, Outbid, Loses $4 Billion of A.A.R.P. Work*, N.Y. TIMES (Sept. 12, 1996), http://www.nytimes.com/1996/09/12/business/prudential-outbid-loses-4-billion -of-aarp-work.html.

[10] AARP, *Consolidated Financial Statements Together with Report of Independent Certified Public Accountants*, Dec. 31, 2015 and 2016, https://www.aarp.org/content/dam/aarp/about_aarp/annual_reports/2016/2015-financial-statements-AARP.pdf.

other words, AARP takes a premium rebate from member insureds' monthly payments before sending the actual premium to bind coverage on to UnitedHealth, net of the 4.9% rebate.

35.     In addition, UnitedHealth allows AARP to hold the member insureds' premium payments during a grace period thereby allowing the group policyholder to earn additional money during this time period. This is significant since, while an insured thinks they have written a check to UnitedHealth and bound coverage, instead, their premiums were redirected to AARP so that AARP could earn $45.7 million in 2016, and actually lose over $3.9 million in 2015. The coverage of a member insured is thus dependent on AARP, a non-insurer, funding the deficit created based on its risky gambling of insurance premiums during a so-called "grace period." UnitedHealth's further inducement offered to AARP, the ability to earn millions from investing the premiums during the grace period, is just another rebate in addition to the "royalty" since UnitedHealth should be the entity earning these returns, or the member insureds should have these amounts held in their own accounts.

36.     To be sure, this side arrangement premium rebating scheme between UnitedHealth and AARP is **nowhere** disclosed to insureds in the Policy. The Certificate of Insurance[11] notes that "This *Certificate*, any riders which may be issued or attached, your application, and the *Group Policy* make up the entire contract." (Emphasis in original). Therefore, the Policy is collectively the Certificate of Insurance, the member insured's application, and the master Group Insurance Policy. The "royalty" side arrangement (the 1997 Agreement and 2017 Agreement) is not part of the insurance contract. In fact, no mention of the royalty **or any payment to AARP whatsoever** is referenced anywhere within the Policy.

---

[11] The Certificate of Insurance is provided to insureds upon enrollment. Insureds can access the Group Insurance Policy only if they go to AARP's headquarters in Washington D.C. during regular business hours and request the document in person, an absurd requirement given the importance of this document to insureds.

37.     While Defendants disclose in marketing materials that a "royalty" is paid to AARP for use of its intellectual property, this disclosure is a deceptive label, and does not accurately or fully explain the illegal arrangement. Regardless, marketing materials are not incorporated into the governing Policy documents and thus the Policy is utterly silent on the "royalty" payment.

38.     CUIPA expressly prohibits insurers from premium rebating, paying inducements to enter health insurance contracts, or providing anything of value not specified in the policy of insurance.

39.     The "royalty" payment is a $400+ million per year inducement to insurance that is truly a premium rebate, and is certainly a valuable consideration or inducement not specified in the policy of insurance, and is thus illegal under Connecticut law.

40.     Given that the amount of the royalty is over $400 million per year, it certainly is "valuable consideration." In addition, UnitedHealth offering AARP over $400 million per year in tax free cash for keeping UnitedHealth as the underwriter for AARP's group insurance plan is certainly a massive cash "inducement" to enter, and continue with, the group policy arrangement. Therefore Conn. Gen. Stat. §38a-825 is being violated on multiple levels.

41.     Defendants' scheme is furthered by its manipulation of certain insurance terms.

42.     The "Group Insurance Policy" document uses the term "premium" to mean the amount of money AARP pays to UnitedHealth for the coverage of its members. The "Group Insurance Policy" uses the term "premium contribution" when referring to the amount of money each insured pays on a monthly basis. Similarly, in the 1997 Agreement, AARP and UnitedHealth refer to the monthly amount paid to UnitedHealth after removal of the "royalty" as the "gross premium" whereas the amount paid each month by the insured, which includes the "royalty," is termed the "member contribution."

43.     The "Certificate of Insurance" provided to insureds upon enrollment defines the term "Premium" as "the monthly payment you [*i.e.*, the member insured] are required to make to us for coverage under this *Plan*."  *See* Ex. A.

44.     The Group Insurance Policy notes the following with respect to Premiums:

**A.  PAYMENT OF PREMIUMS - POLICYHOLDER GRACE PERIOD.**
Premiums are to be paid by the Policyholder [AARP] to United HealthCare. One is due on each Premium Due Date stated in the Group Policy Schedule. The Policyholder [AARP] may pay each premium other than the first within 31 days of the Premium Due Date without being charged interest. Those days are known as the grace period. The Policyholder [AARP] is liable to pay premiums to United HealthCare for the time the Group Policy is in force.

**B.  PREMIUM AMOUNTS.**
The premium due on each Premium Due Date is the sum of the premium charges for the insurance under the Coverages. Those charges are determined from the premium rates then in effect and the Members then insured. United HealthCare will give this information to the Policyholder.

Premiums may be determined in another way. But it must produce about the same amounts and be agreed to by the Policyholder and United HealthCare.

*See* Ex. C, at 6.

45.     Part of Defendants' deception of consumers is thus using the term "premium" to mean two different things in the Certificate of Insurance (the total amount paid by consumers) and the Group Insurance Policy (the total amount AARP passes along to UnitedHealth net of the "royalty"). Without having access to the side arrangement "royalty" agreement, someone reviewing the Certificate of Insurance and the Group Insurance Policy would not be able to tell that the term "premium" means two different things in these Policy documents. This deceptive use of language is just a way to avoid admitting to consumers that the 4.9% "royalty" is actually on top of the premium due to UnitedHealth for coverage. In the Certificate of Insurance, the term "premium" is equivalent to the "member contribution" term used in the 1997 Agreement which includes the "royalty," whereas in the Group Insurance Policy, "premium" is equivalent to the "gross premium" term in the 1997 Agreement, which does not include the "royalty." Defendants

want consumers to think that their payment is going entirely towards premiums to bind insurance coverage, when in fact it is not.

46.     Plaintiff and the Class (defined below) agreed to pay a monthly premium for insurance coverage, not a monthly premium plus a 4.9% charge used to fund an illegal rebating scheme between Defendants and fund an investment vehicle for AARP. Defendants' misrepresentations induced Plaintiff and the Class into paying more for their Medigap insurance than they otherwise would or should have if they had known the truth.

47.     Defendants' misrepresented the true cost of the AARP Medigap insurance in order to extract more money from Plaintiff and the Class than what was actually owed for coverage and other legal purposes.

48.     Defendants' had a duty to disclose the true nature of their relationship with respect to AARP Medigap, that a percentage-based payment was being added on top of the premium due for insurance coverage, and that AARP was being paid (or induced) for its sponsorship as the group policyholder of the group plan.

49.     Despite the language of the Certificate of Insurance which indicates that the monthly payment made by each policyholder is then passed on as the "premium" to UnitedHealth each month, in reality AARP is taking a 4.9% cut of the insureds' payment before passing along the balance to UnitedHealth for the actual insurance coverage. Insureds are charged premium plus 4.9% each month when they think they are only making a premium payment.

50.     This 4.9% rebate is in *addition* to expense reimbursements to AARP for administering the insurance program. The 4.9% is thus pure untaxed profit to AARP.

51.     AARP's Consolidated Financial Statements for December 31, 2016 and 2015[12] also refer to two different types of "premiums" – the amount an insured pays each month ("premium payments from member participants") versus the 4.9% lesser amount AARP actually remits for the insurance coverage to the carrier ("premiums payable to the insurance underwriters").

52.     Importantly, according to the 1997 Agreement, AARP's allowance/"royalty" is charged to consumers on top of the premiums paid for the actual insurance coverage: "SHIP GROSS PREMIUMS for a Policy Year means the amount of Member Contributions minus the AARP allowance determined under Section 6.1 hereof for such policy year." The 1997 Agreement distinguishes between the amount actually billed to and paid by consumers (*i.e.*, "Member Contributions") and the insurance premiums themselves (*i.e.*, "GROSS PREMIUMS").

53.     In addition, the Trust Decl. which governs the AARP Insurance Plan specifically notes that the "allowance" and the premium are two separate amounts, "Trustees are authorized to receive and to retain dividends and administrative allowances on group insurance policies…provided further, however, that insurance premiums shall be kept, handled and disbursed separately by the Trustees solely for the use and benefit of the Member-Insureds of the AARP Insurance Plan." *See* Ex. E, Trust Decl. at 13 and 44.

54.     Consistent with these provisions, A. Barry Rand, the former Chief Executive Officer of AARP, testified before the United States Congress House Ways and Means Committee ("Committee") on April 1, 2011, that "royalties have nothing to do with the premiums of beneficiaries.  Nothing to do with the premiums."  Mr. Rand also testified that "[a]ll

---

[12] *See supra* note 10.

of the money that we have that comes out of the trust in interest goes to our mission.  None of the money is taken out of any of the premiums."

55.     AARP's former President, W. Lee Hammond, also testified to the Committee that the "royalty" payment was in addition to the premiums for insurance coverage: "We do take royalty payments from that money that comes in, and then, as requested by the insurance companies to cover their products, we return the balance of that money to them."

56.     Therefore, even though the Policy indicates an insured will pay the "premium" and this "premium" will be remitted to UnitedHealth, in reality because of the confidential side arrangement between the Defendants, insureds are paying the "premium" plus 4.9% to AARP. Thus, disclosures from Defendants on their websites like the following, which indicates that all of an insured's monthly payments go toward legal purposes namely insurance coverage not a rebate to AARP, are false and misleading: "Premiums are collected from you on behalf of the trustees of the Trust.  These premiums are used to pay expenses incurred by the Trust in connection with the insurance programs and to pay the insurance company for your insurance coverage."[13]

57.     The Policy, an insurance contract, does not authorize or allow AARP to take 4.9% from insured's monthly payments. The Policy also does not allow for the charging of premium plus an additional 4.9%. Defendants are breaching the terms of the Policy, and engaging in an illegal premium rebating scheme, unwittingly funded by the member insureds who are caused financial harm by having to pay an illegal charge on top of premiums due for coverage.

58.     Terming the rebate a "royalty" is a fiction so that AARP can claim the $400+ million per year payment tax free. In exchange for acting as the group plan "sponsor[]", the

---

[13]  UnitedHealthcare, Disclaimers, https://www.uhcmedicaresolutions.com/disclaimer.html (last visited May 9, 2018).

original version of the 1997 Agreement provided AARP with a 4% "allowance" for every dollar

that flowed through the AARP Insurance Plan, as well as an additional 2.5% for each dollar over

$1 billion processed by the AARP Insurance Plan:

ARTICLE 6
ALLOWANCES AND COMPENSATION

> 6.1 AARP ALLOWANCE.  AARP shall be entitled to receive an allowance for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith.  For each Policy Year, this allowance shall be equal to the sum of (i) four percent of the first $1 billion in Member Contributions plus (ii) two and one-half percent of the Member Contributions in excess of $1 billion. This allowance shall be payable in accordance with Section 6.7 hereof.

*See* Ex. D, at 39.

59.     But two years after entering the side arrangement, the IRS demanded that AARP

pay taxes on its extraordinary income from the insurance program. With the sweep of a pen the

"allowance" became a "royalty" and AARP agreed to pay taxes on just a small portion of the

hundreds of millions per year in its settlement with the IRS.[14]

60.     Defendants' current reference to their side payment as a "royalty" is false and

misleading. When the parties first entered the side arrangement, it was an "allowance" for the

transacting of insurance, including soliciting consumers, AARP performed for UnitedHealth, not

a "royalty." Further it makes no logical sense that UnitedHealth would pay AARP for the use of

---

[14] The 1997 Agreement was amended on December 28, 1999 in connection with AARP's settlement with the IRS. *See* Amendment and Assignment: United HealthCare Insurance Company, American Association of Retired Persons, Trustees of the AARP Insurance Plan, AARP Services, Inc. Exhibit 10(s) (Dec. 28, 1999), https://www.sec.gov/Archives/edgar/data/731766/000095013403004178/c74996exv10wxsy.txt.     The 1999 amendment, *inter alia*, rechristened AARP's "allowance" a "royalty" and directed 8% of AARP's "royalty" to its taxable subsidiary, ASI:

> It is intent [sic] of the parties hereto that the payment made by United to AARP pursuant to the United Agreement and referred to as an allowance is a royalty and pursuant to this Assignment and the agreement referred to in this paragraph, the royalty is to be bifurcated into a payment to AARP Services for Quality Control and monitoring and to AARP for use of the AARP Marks. AARP shall grant United an exclusive license to use the AARP Marks by separate agreement. Such separate agreement shall obligate United to compensate AARP for the use of its intangible property by the payment of a royalty.

its trademarks when promoting AARP's ***own group insurance plan***. In reality, the "royalty" is a poorly disguised attempt to skirt anti-rebating laws, as well as insurance agent licensing laws, and paying taxes.

61. To be clear, there is nothing wrong with an association offering group insurance to its members, in order to attract new dues paying members, or retain existing members. It is problematic, however, when an association starts taking payments from the insurance company that underwrites the group plan, especially when the association itself is the group policyholder.

62. But AARP and UnitedHealth have created a deceptive scheme whereby UnitedHealth is supposedly paying hundreds of millions of dollars each year to AARP in order for UnitedHealth to use AARP's logo to promote AARP's own group insurance plan. This circular licensing, however, is merely a ruse – given that the group plan is AARP's own group plan run by the AARP Insurance Plan, why would UnitedHealth pay AARP in order to use AARP's logos to promote AARP's own group insurance plan? It would not.

63. In reality, AARP promotes and runs a massive group health insurance plan and as inducement to enter into, and remain with UnitedHealth as the carrier, UnitedHealth allows AARP to take an inducement allowance each and every month unwittingly funded entirely by consumers.

64. All of this language manipulation indicates that Defendants are aware that their arrangement is illegal and that they have gone to great lengths to cover it up.

65. In addition to AARP Medigap, AARP also receives revenue from UnitedHealth in connection with AARP's endorsement of UnitedHealth's Medicare Advantage insurance program. Unlike the AARP Medigap percentage-based rebating scheme alleged herein, under the Medicare Advantage program, AARP is paid a flat fixed fee. The reason for the difference in the Medicare Advantage compensation arrangement is because the federal government, which

has more input into Medicare Advantage HMO programs since the government is directly funding the HMO, viewed the "royalty" arrangement as a kickback:

> The American Association of Retired Persons said yesterday that it had revised a sharply criticized plan to endorse selected health maintenance organizations, dropping a proposal to collect royalty payments for each of its members who joined an H.M.O.

> The royalties proposal had drawn fire from Government officials and industry experts, who suggested that it might violate Medicare anti-kickback laws. Federal laws forbid payments in cash or otherwise for referrals of Medicare beneficiaries.[15]

66.     Plaintiff and the Class are injured each month by the actual loss of the 4.9% illegally and secretly charged to them each month. Plaintiff and the Class paid, and continued to pay, an illegally charged hidden fee included in their AARP Medigap insurance payments because of Defendants' funding of their illegal rebating scheme with the money of the member insureds.

67.     Defendants charge the Plaintiff and the Class an illegal fee each and every month through the present, therefore repeatedly violating Connecticut law each and every month by new and distinct acts.

68.     Defendants are not entitled to keep this illegal fee charged to consumers on top of the legal portion of the payment necessary to bind coverage (*i.e.* the true "premium"), therefore Plaintiff and the Class are entitled to injunctive relief prohibiting the repeated violations of Connecticut law, and the Policy, which occur anew each month, as well as disgorgement of the illegal proceeds reaped from same, and all other available remedies.

69.     Alternatively, if Plaintiff and the Class are not entitled to damages or restitution directly, the monies illegally collected for the benefit of AARP in violation of Connecticut law,

---

[15] *See* Milt Freudebheun, *A.A.R.P. Dropping Plans for Royalties In a Health Program*, N.Y. TIMES (Apr. 19, 1997), http://www.nytimes.com/1997/04/19/business/aarp-dropping-plans-for-royalties-in-a-health-program.html.

and the Policy, should be paid back into the assets of the AARP Insurance Plan by Defendants for the benefit and rate stability of the group plan.

70.     This remedy is possible since UnitedHealth holds the assets of the AARP Medigap plan separately from UnitedHealth's other insurance assets.  As noted by UnitedHealth Group in its most recent Form 10-K covering fiscal year 2017, filed with the SEC on February 13, 2018:

> Pursuant to the Company's [UnitedHealth's] agreement, AARP Program assets are managed separately from the Company's general investment portfolio and are used to pay costs associated with the AARP Program. These assets are invested at the Company's discretion, within investment guidelines approved by AARP. The Company does not guarantee any rates of return on these investments and, upon any transfer of the AARP Program contract to another entity, the Company would transfer cash equal in amount to the fair value of these investments at the date of transfer to that entity. Because the purpose of these assets is to fund the medical costs payable, the rate stabilization fund (RSF) liabilities and other related liabilities associated with this AARP contract, assets under management are classified as current assets, consistent with the classification of these liabilities.

> The effects of changes in other balance sheet amounts associated with the AARP Program also accrue to the overall benefit of the AARP policyholders through the RSF balance. Accordingly, the Company excludes the effect of such changes in its Consolidated Statements of Cash Flows.[16]

### Defendants' Scheme Violates the Connecticut
### Unfair Insurance Practices Act, Conn. Gen. Stat. §38a-815

71.     CUIPA states at Conn. Gen. Stat. §38a-815, "No person shall engage in this state in any trade practice which is defined in section 38a-816 as, or determined pursuant to sections 38a-817 and 38a-818 to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance, nor shall any domestic insurance company engage outside of this state in any act or practice defined in subsections (1) to (12), inclusive, of section 38a-816."

---

[16]    UnitedHealth Group, Annual Report (Form 10-K) at p. 48-49 (Feb. 13, 2018), https://www.sec.gov/Archives/edgar/data/731766/000073176618000005/unh2017123110-k.htm.

72.     Defendants conduct violates Conn. Gen. Stat. §§38a-816(1)-(2) in that Defendants' referring to a premium rebate as a "royalty" in their widely published marketing materials (television, print, mailings, websites, internet ads, and radio) is a misrepresentation of the benefits, advantages, conditions and terms of an insurance policy and is an untrue, deceptive and misleading statement with respect to the business of insurance. AARP is the group policyholder. AARP endorsing its own group insurance plan in exchange for hundreds of millions of dollars is nonsensical – why would UnitedHealth have to pay AARP for the use of its logo when the product being sold is AARP's very own group insurance plan? The 4.9% payment is a premium rebate, not a "royalty" and calling it such in marketing materials and other disclosures is deceptive and misrepresents the true nature of this payment. The reason for the deception is so AARP can avoid the payment of taxes.  For example, one AARP Medigap disclaimer notes, "Premiums are collected from you on behalf of the trustees of the Trust.  These premiums are used to pay expenses incurred by the Trust in connection with the insurance programs and to pay the insurance company for your insurance coverage."[17] This disclaimer, and other similar disclaimers, do not explain that the amount actually charged to consumers is 4.9% above the premiums "used to pay expenses incurred by the Trust in connection with the insurance programs and to pay the insurance company for your insurance coverage." This is a material misrepresentation and omission which is deceptive and misleading. A reasonable consumer would read this and incorrectly believe that his/her monthly payment is going to be used for these legal purposes alone, not that their monthly payment also included a 4.9% charge to fund an illegal rebating scheme.

---

[17] UnitedHealthcare, Disclaimers, *supra* note 13.

73.     Plaintiff and the Class relied on Defendants' representations that all of the money paid to UnitedHealth each month was going towards "premiums" for insurance coverage and other legitimate costs of the program, rather than 4.9% of it going to fund an illegal rebating scheme. Plaintiff and the Class relied on the Policy to believe that its payments were going to UnitedHealth to bind coverage, not to AARP's risky investment vehicle.  Had Plaintiff and the Class known the truth they would have purchased their insurance from a reputable carrier not engaged in risky illegal activities.

74.     Defendants conduct violates Conn. Gen. Stat. §38a-816 (4) in that UnitedHealth entering into the exclusive 1997 Agreement and 2017 Agreement with AARP whereby AARP is prohibited from endorsing any other Medigap insurer is an agreement to commit an act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance. The results are the extraordinary market share enjoyed by UnitedHealth with over three times the number of insureds as its nearest Medigap competitor. Such extraordinary market share acquired through illegal means, harms competition in the Medigap insurance market since new companies thinking about entering the market are faced with competing against an unnaturally strong and dominant insurer, UnitedHealth. Thus competition is reduced and consumers, including Plaintiff and the Class, are harmed by less competition in the Medigap marketplace.

75.     Defendants conduct violates Conn. Gen. Stat. §38a-816 (8) in that the application for AARP Medigap makes no mention whatsoever of any "royalty" payment or rebate inducement of 4.9% being paid to AARP from the Class members' monthly payments. In fact, no mention of AARP receiving any compensation whatsoever is mentioned in the application. These intentional omissions constitute false statements relative to an application for an insurance policy for the purpose of obtaining the rebating fee from the individual insureds.

76.     Defendants conduct violates Conn. Gen. Stat. §38a-816 (9), in that Defendants charge, collect, and pay rebates to AARP as an inducement to insurance, and AARP accepts such rebates.  Such a rebate, hundreds of millions of dollars annually, is valuable consideration not specified in the Policy that induces AARP to keep its group Medigap plan with UnitedHealth as the insurer.

### Defendants' Scheme Has Caused Injury to Plaintiff and the Class, and Disgorgement of the Illegal Rebate Amounts by Defendants Is Necessary

77.     Each and every month, Defendants are charging an illegal and *per se* unreasonable rebate fee to Plaintiff and the Class in violation of Connecticut law and in breach of the Policy.

78.     Defendants have no right under Connecticut law or the Policy to either charge consumers this illegal rebate amount every month, or retain this illegal 4.9%, and it should therefore be returned to Plaintiff and the Class or, alternatively, to the assets backing the AARP Medigap plan.

79.     Defendants' unlawful and deceptive scheme takes advantage of unsuspecting Medicare recipients who put their trust in the AARP name.

80.     As a result of Defendants' unlawful acts and conduct, consumers are harmed financially in that they are paying a 4.9% illegal rebate fee above the actual cost of insurance coverage so that UnitedHealth and AARP can illegally divert this 4.9% charge to the group policyholder, AARP.

81.     But for Defendants' deceptive and unlawful acts, Plaintiff and the other members of the Class would not have willingly funded the illegal rebating scheme as part of their monthly payments for AARP Medigap.

**Plaintiff's Claims Are Timely Under the Continuing
Tort Doctrine and the Discovery Rule**

82.     Every month, each Class member either writes a check to UnitedHealth, or has their bank account auto debited by UnitedHealth, for the member contribution amount which includes an illegally 4.9% rebate that flows to the group policyholder AARP in violation of Conn. Gen. Stat. §38a-825 and the Policy. This member contribution amount ends up in the hands of AARP, where it is invested, and then later, AARP removes the illegal rebate for itself before remitting the "gross premiums" to UnitedHealth in order to bind coverage.

83.     This process is repeated each and every month through the present, and Section 38a-825 is violated each and every month based on these new and distinct actions taken by Defendants.

84.     Neither the Certificates of Insurance, the applications for coverage for the member insureds, nor the Policy itself makes any mention of the side arrangement between AARP and UnitedHealth, which is illegal under Section 38a-825.

85.     In fact, as noted above, Defendants just renewed and extended the 2017 Agreement, which directly impacts the entire Class and further reinforces Plaintiff's position that this is a repeating harm, not a one-time event that occurred on January 1, 2014, when Plaintiff first enrolled in the AARP Medigap plan.

86.     Each year during Medigap open enrollment when consumers can switch Medigap carriers, all AARP Medigap plan members, including Plaintiff and the Class, either purchase into the AARP Medigap insurance plan as new members, or if existing members, they renew their AARP Medigap insurance by continuing to make their monthly payments.

87.     Each monthly member contribution payment made to UnitedHealth for AARP Medigap insurance by Plaintiff and members of the Class includes the new and distinct illegal

rebating charge of 4.9% that is taken each month by AARP, which Plaintiff alleges herein is an unlawful rebate under Section 38a-825 and is also a breach of the Policy.

88.     Each monthly payment of the member contribution amount, whether it is an initial purchase for a new plan member, or a renewal for an existing plan member, of AARP Medigap by Plaintiff and members of the Class, and concomitant siphoning off of 4.9% of their "member contribution" by AARP, creates a new and distinct injury proximately caused by Defendants' repetitive wrongful acts described herein.

89.     As recently as May 5, 2018, Plaintiff's AARP Medigap insurance policy with Defendants automatically renewed when his monthly "member contribution" was debited from his bank account by Defendants.

90.     Defendants have not ceased the wrongful acts alleged herein, but instead continue to engage in their scheme allowing AARP to siphon off 4.9% from the "member contributions" paid by Plaintiff and the Class every month through the present for their AARP Medigap coverage.

91.     In addition, Plaintiff did not gain knowledge of the illegal charge hidden in his monthly payments until his attorney alerted him to this scheme in April 2018, nor could he have gained such knowledge, even in the exercise of reasonable diligence, until advised of the practice by his attorney.

92.     Plaintiff had no reason to seek out and review the 2017 Agreement, a private illegal side agreement between AARP and UnitedHealth. Nor could he have since AARP and UnitedHealth keep the details private, as reported by Forbes: "Though the AARP deal has benefited UnitedHealth Group sales, it hasn't been without controversy over the years. Neither

- 25 -

party discloses a specific financial benefit from the deal and AARP makes money off of it, though the lobby for seniors doesn't disclose how much UnitedHealth pays the association."[18]

93.     Plaintiff had no reason to search various state rate filings to come across information filed in the State of Rhode Island that explicitly shows both the amount of the "royalty" charge, and that the charge is a separate line item percentage of the "member contribution" that is paid each month by the insured.

94.     Regardless of when Plaintiff and the Class members discovered, or should have discovered, Defendants' illegal scheme to disguise an illegal rebate fee charged to consumers each month as a "royalty," Defendants' scheme is repetitive and ongoing. Month after month through the present, Defendants charge consumers for an illegal rebate that is not mentioned in the Policy and allow AARP to take this illegal rebate from the "member contribution" amount – all of which consumers think is going to legal purposes and insurance coverage only. Conn. Gen. Stat. §38a-825 is violated and the Policy is breached anew each and every month by these new and distinct acts. And Conn. Gen. Stat. §38a-825 was certainly violated and the Policy was certainly breached anew in July 2017 when Defendants renewed and extended the so-called "royalty" arrangement.

## CLASS ALLEGATIONS

95.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually, and on behalf of the following Class:

> All persons in the United States who formerly or currently participate in a group AARP Medicare Supplement Insurance Plan insured by UnitedHealthcare Insurance Company.

---

[18] Bruce Japsen, *UnitedHealth Group, AARP Extend Medicare Partnership Beyond 2025*, Forbes (July 17, 2017) https://www.forbes.com/sites/brucejapsen/2017/07/17/unitedhealth-aarp-extend-medicare-partnership-beyond-2025/#552b19171b53.

96.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

97.     Specifically excluded from the Class are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

98.     *Numerosity*.  The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  As of December 2016 there were 4,279,361 insureds enrolled in AARP Medigap. In Connecticut alone, there are 97,954 insureds. Although the precise number of current Class members is unknown to Plaintiff, the true number of Class members is known by Defendants.  More specifically, UnitedHealth maintains databases that contain the following information: (1) the name of each Class member enrolled in an AARP Medigap plan; (2) the address of each Class member; and (3) each Class member's payment information related to AARP Medigap.  Thus, Class members may be identified and notified of the pendency of this action by first class mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

99.     *Existence and predominance of common questions of law and fact*.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, without limitation, the following:

(a)     whether the 1997 Agreement and 2017 Agreement between UnitedHealth and AARP violates Conn. Gen. Stat. §§38a-816(1)-(2), (4), (8), and/or (9);

(b)     whether Defendants conduct undertaken in furtherance of the 1997 Agreement and 2017 Agreement violates Conn. Gen. Stat. §§38a-816(1)-(2), (4), (8), and/or (9);

(c)     whether Defendants conduct undertaken in furtherance of the 1997 Agreement and 2017 Agreement violates or is in breach of the terms of the Policy;

(d)     whether Plaintiff and the Class have sustained monetary loss and the proper measure of that loss;

(e)     whether Plaintiff and the Class are entitled to declaratory and injunctive relief;

(f)     whether Plaintiff and the Class are entitled to disgorgement;

(g)     whether Plaintiff and the Class are entitled to restitution; and

(h)     whether Plaintiff and the Class are entitled to treble and/or punitive damages.

100.    *Typicality*.  Plaintiff's claims are typical of the claims of the other members of the Class in that Defendants are taking a deceptive, secretly charged illegal rebating fee from Plaintiff in the very same manner as each member of the Class every month.

101.    *Adequacy of Representation*.   Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

102.    *Superiority*.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by

individual Class members is relatively small compared to the burden and expense of individual litigation of their claims against Defendants.   It would, thus, be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Class members could afford such individualized litigation, the court system could not.   Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.   Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.   By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

103.   The Class may also be certified because:

(a)   the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

(b)   the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)   Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## COUNT I

## (VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT)

104.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

105.     Defendants have acted, as alleged herein, in the conduct of trade or commerce as defined in Conn. Gen. Stat. §42-110a(4).

106.     CUIPA states, "No person shall engage in this state in any trade practice which is defined in section 38a-816 as, or determined pursuant to sections 38a-817 and 38a-818 to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance, nor shall any domestic insurance company engage outside of this state in any act or practice defined in subsections (1) to (12), inclusive, of section 38a-816."

107.     Defendants have regularly been engaged, as part of its general business practices given that the so-called "royalty" is charged to all insureds in the same amount and in the same manner each month, in the following intentional conduct in violation of CUIPA: (a) engaging in a premium rebating scheme funded by the Class in violation of Conn. Gen. Stat. §38a-816(9) (through violation of anti-rebating Conn. Gen. Stat. §38a-825) and in breach of the terms of the Policy; (b) misrepresenting the benefits, advantages, conditions or terms of any insurance policy in violation of Conn. Gen. Stat. §38a-816(1); (c) making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or

misleading in violation of Conn. Gen. Stat. §38a-816(2); (d) entering into an agreement to commit an act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance in violation of Conn. Gen. Stat. §38a-816(4); and (e) making false or fraudulent statements or representations relative to an application for an insurance policy for the purpose of obtaining a fee, commission, money or other benefit from an individual in violation of Conn. Gen. Stat. §38a-816(8).

108.    Defendant's violations of CUIPA are violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110b(a) and give rise to a cause of action under Conn. Gen. Stat. §42-110g(a).

109.    Defendants' conduct is part of a general business practice that constitutes unfair and deceptive acts in violation of Conn. Gen. Stat. §42-110b(a).

110.    As a direct and proximate result of Defendants' violation of CUTPA, Conn. Gen. Stat. §42-110b(a), Plaintiff and the Class members have suffered ascertainable losses under Conn. Gen. Stat. §42-110g(a) in an amount to be proved at trial.

111.    As a result of Defendants' unfair and/or deceptive acts or practices, Defendants have reaped ill-gotten profits and gains, which they otherwise would not have received and which, in equity, they should be required to disgorge.

112.    Defendants are liable, pursuant to Conn. Gen. Stat. §42-110g(a), for treble damages.

113.    Furthermore, Defendants are liable, pursuant to Conn. Gen. Stat. §42-110g(d), for costs and reasonable attorneys' fees.

114.    Plaintiff also seeks an injunction on behalf of himself and the Class prohibiting Defendants from violating CUTPA and/or CUIPA, and breaching the Policy's terms, pursuant to Conn. Gen. Stat. §42-110g(d).

115.    In compliance with Conn. Gen. Stat. §42-110g(c), a copy of this Class Action Complaint has been submitted via email to the Attorney General of the State of Connecticut and Connecticut's Commissioner of Consumer Protection on this date. A copy has also been submitted to the Connecticut Insurance Department.

## COUNT II

## (BREACH OF CONTRACT)

116.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

117.    Defendants formed an agreement and entered into a contract of insurance with Plaintiff and the Class, namely the Policy, including offer, acceptance, and consideration.

118.    Pursuant to that Policy, Plaintiff and the Class paid money to Defendants in exchange for Defendants providing benefits under a group insurance policy to Plaintiff and the Class.

119.    The Policy included, without limitation, Defendants' right to charge a premium for coverage. The Policy did not provide Defendants' with a right to charge a premium for coverage plus a 4.9% rebating fee.

120.    Plaintiff and the Class performed their obligations under the contract by paying the amounts due under the contract timely.

121.    Defendants breached the Policy by, without limitation, charging 4.9% above the premium actually due for coverage from UnitedHealth.

122.    As a direct and proximate result of Defendants' breach of contract, Plaintiff and the Class have suffered damages in an amount to be proved at trial.

## COUNT III

### (UNJUST ENRICHMENT)
### (Pled in the Alternative to Count II)

123.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

124.    Plaintiff brings this claim for unjust enrichment against Defendants in the alternative to Count II, Plaintiff's claim for Breach of Contract.

125.    Defendants have benefited by charging, collecting, and retaining the 4.9% rebating fee, as well as the gains on investments of member contributions that flowed to AARP alone, to which the Plaintiff and the Class members were entitled.

126.    Defendants are unjustly retaining these amounts owed to Plaintiff and the Class.

127.    As a direct and proximate result of Defendants charging, collecting, and retaining the 4.9% rebating fee, as well as the gains on investments of member contributions that flowed to AARP alone, Plaintiff and the Class have suffered damages in an amount to be proved at trial.

## COUNT IV

### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

128.    The duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship.

129.    Plaintiffs and the Class are parties to a contract with the Defendants, namely the Policy.

130.    Defendants knew, by its manipulation of the term "premium" in the Policy, through their entering into the side 1997 Agreement and the 2017 Agreement, that they were not faithfully fulfilling their duties under the Policy.

131.    Specifically, Defendants deceived Plaintiff and the Class into thinking that the insureds' monthly "premium" payments were going fully towards the "premium" paid to

UnitedHealth for coverage and other legal purposes, not that their monthly payment was being diverted to AARP where it was invested in risky securities and then passed on to UnitedHealth 4.9% lighter.

132.     Plaintiff and the Class suffered damages as a result of Defendants' bad faith scheme to divert funds to AARP in violation of the letter and spirit of the Policy.

## DISGORGEMENT

133.     Defendants' assets are subject to the equitable remedy of disgorgement, which is the forced relinquishment of all benefits that would be unjust for Defendants to retain, including all ill-gotten gains and benefits or profits that result from Defendants' illegal actions. Defendants should be ordered to disgorge all monies illegally taken from Plaintiff and Class members together with all of the proceeds, profits, income, interest, and accessions thereto. Such disgorgement should be for the benefit of victimized Class members and Plaintiff or, alternatively, for the benefit of the AARP Insurance Plan's assets held by UnitedHealth to promote the financial stability of the group plan – not the financial stability of AARP, Inc. and ASI.

134.     Defendants include a blatantly illegal charge in the amount billed to Class members each month for AARP Medigap coverage. Defendants are not entitled to keep this illegal charge, it should be returned to Plaintiff and the Class or in the alternative, to the assets backing the AARP Insurance Plan held by UnitedHealth.

## APPLICATION FOR PERMANENT INJUNCTION

135.     Because Defendants have engaged in the unlawful acts and practices described above, Defendants have violated and will continue to violate the law as alleged in this Class Action Complaint.  Unless immediately restrained by this Honorable Court, Defendants will continue to violate the laws of the State of Connecticut and cause immediate, irreparable injury,

loss, and damage to Plaintiff and the Class.  Therefore Plaintiff requests a Permanent Injunction as indicated below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief in his favor and in favor of the Class and against Defendants as follows:

A.      Plaintiff prays that Defendants be cited according to law to appear and answer herein; that after notice and upon final hearing a PERMANENT INJUNCTION be issued, restraining and enjoining Defendants, Defendants' successors, assigns, officers, agents, servants, employees, and attorneys and any other person in active concert or participation with Defendants, from engaging in the acts or practices complained of herein.  In addition, Plaintiff respectfully prays that this Court will:

B.      Order Defendants to restore all money or other property taken from identifiable persons by means of unlawful acts or practices and award judgment for damages in an amount within the jurisdictional limits of this Court to compensate for such losses;

C.      Order the disgorgement of all sums taken from consumers for the benefit of Plaintiff and the Class or, in the alternative, for the benefit of the AARP Insurance Plan's assets held by UnitedHealth, together with all proceeds, interest, income, profits, and accessions thereto;

D.      Certify this action and the Class as requested herein, appointing Plaintiff as Class Representative, and appointing Stuart A. Davidson of Robbins Geller Rudman & Dowd LLP, Sean K. Collins of the Law Offices of Sean K. Collins, and Ex Kano S. Sams II of Glancy Prongay & Murray LLP as Class Counsel;

E.     Award Plaintiff and the Class members actual damages, plus costs and reasonable and necessary attorneys' fees, and any other relief the Court determines is proper, pursuant to Conn. Gen. Stat. §42-110g(d);

F.     Award restitution and disgorgement of Defendants' revenues to Plaintiff and the Class or, alternatively, to the AARP Insurance Plan's assets held by UnitedHealth;

G.     Award treble damages to Plaintiff and Class members, pursuant to Conn. Gen. Stat. §42-110g(a); and

H.     Provide such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by a jury on all issues so triable.

DATED:  May 10, 2018                    LAW OFFICES OF SEAN K. COLLINS
                                        SEAN K. COLLINS [ct29296]


                                        _s/Sean K. Collins_
                                        _____
                                        SEAN K. COLLINS

                                        184 High Street, Suite 503
                                        Boston, MA  02110
                                        Telephone:  617/320-8485
                                        617/227-2843 (fax)
                                        sean@neinsurancelaw.com

                                        ROBBINS GELLER RUDMAN & DOWD LLP
                                        STUART A. DAVIDSON
                                        CHRISTOPHER C. GOLD
                                        DOROTHY P. ANTULLIS
                                        120 East Palmetto Park Road, Suite 500
                                        Boca Raton, FL  33432
                                        Telephone:  561/750-3000
                                        561/750-3364 (fax)
                                        sdavidson@rgrdlaw.com
                                        cgold@rgrdlaw.com
                                        dantullis@rgrdlaw.com

GLANCY PRONGAY & MURRAY LLP
LIONEL Z. GLANCY
EX KANO S. SAMS II
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone:  310/201-9150
310/432-1495 (fax)
lglancy@glancylaw.com
esams@glancylaw.com

HASSETT & GEORGE, P.C.
LOUIS N. GEORGE
945 Hopmeadow Street
Simsbury, CT  06070
Telephone:  860/651-1333, Ext. 121
860/651-1888 (fax)
lgeorge@hgesq.com

*Attorneys for Plaintiff*